UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CHAPTER 11

IN RE: JAYEL CORPORATION                           DEBTORS-IN-POSSESSION
                                                   CASE NO. 5:10-bk-71120

DISCLOSURE STATEMENT
OF
JAYEL CORPORATION

I.

INTRODUCTION

JAYEL CORPORATION is the Debtor in a Chapter 11 bankruptcy case. On March 5, 2010, Jayel Corporation commenced a bankruptcy case by filing a chapter 11 petition under the Bankruptcy Code. Chapter 11 allows the Debtor, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization ("Plan"). The Plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. Jayel Corporation is the party proposing the Plan sent to you in the same envelope as this document. THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN. The Plan is included only for informational purposes to more fully disclose the Debtor's intent in this bankruptcy. The Plan enclosed may be modified and may not be the final Plan submitted to you in a subsequent mailing. The Debtor is first required to gain approval of his Disclosure Statement and then will seek approval of the Plan once the Disclosure Statement is approved. You will be sent by subsequent mailing a copy of said Plan with a ballot allowing you to approve or reject the Debtor's proposed Plan.

    A. **Purpose of this Document**

This disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:

(1) WHO CAN VOTE OR OBJECT,

(2) WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed), AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION,

(3) THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY,

(4) WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,

(5) WHAT IS THE EFFECT OF CONFIRMATION, AND

(6) WHETHER THIS PLAN IS FEASIBLE.

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own attorney to obtain more specific advice on how this Plan will affect you and what is the best course of action for you. The Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Plan must contain enough information to enable parties affected by the Plan to make an informed judgment about the Plan.

**B. Deadlines for Voting and Objecting; Date of Approval of Disclosure Statement and Date of Plan Confirmation Hearing**

You are being sent this information as the first step in the Plan Confirmation process. Included with this Disclosure Statement is a Notice of Opportunity to Object. If you do not object to the Disclosure Statement, the Debtor will send the Court an Order seeking Approval of the Disclosure Statement and will then send you a copy of the proposed Plan along with a ballot giving you the opportunity to accept or reject the Plan. If there are any inconsistencies between the Plan and the

Disclosure Statement, the Plan provisions will govern. Again, the Disclosure Statement is a document which serves to provide you with enough information for you to make an informed decision about the Debtor's Plan. If you object to the Disclosure Statement as containing inadequate information, you should file your objection with the Bankruptcy Court and your objection will be set for hearing before the Bankruptcy Judge.

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT BINDING ON ANYONE. YOUR APPROVAL OF THIS DISCLOSURE STATEMENT IS NOT THE SAME AS YOUR APPROVAL OF THE PLAN AND DOES NOT BIND YOU TO THE TERMS OF THE PLAN. THE COURT WILL NOT CONFIRM THE DEBTOR'S PLAN UNTIL YOU HAVE RECEIVED A COPY OF THE PLAN ALONG WITH A BALLOT AND HAVE THE OPPORTUNITY TO VOTE ON YOUR ACCEPTANCE OR REJECTION OF THE PLAN. WHEN THE COURT CONFIRMS THE PLAN AFTER NOTICE AND A HEARING, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

C. Disclaimer

The financial data relied upon in formulating the Plan is based on the Debtor's best knowledge and belief. The information contained in this Disclosure Statement is provided by the Debtor's bookkeeper and is based upon the reports generated by said bookkeeper. The Court has not yet determined whether or not you should support the Plan. The Financial Statements herein are unaudited.

II.

BACKGROUND

A. Description and History of the Debtor's Business

The Debtor is an Arkansas corporation. The Debtor is in the business of real estate development

and providing real estate management services. The Debtor has been in business since March 1986.

### B. Principals/Affiliates of Debtor's Business

The Principals of Debtor's Business are James H. Lemmon who owns a 50% interest and Jean A. Lemmon who owns the other 50% interest. James H. Lemmon and Jean A. Lemmon are husband and wife.

### C. Management of the Debtor Before and After the Bankruptcy

Management of the Debtor's Business over the life of the Company has been by James H. Lemmon. James H. Lemmon has continued in management of Debtor's business since the filing of the bankruptcy and will continue to do so throughout the Plan term. James H. Lemmon has hired many individuals over the life of the company to work in junior management capacities; however, James H. Lemmon has always been the decision maker for the Company. Currently, there are three people working for the Debtor, namely Bradley W. Birchfield, James D. Coursey, and Jeremy Cunningham. Jeremy will no longer be working for the Debtor after June 2010. Bradley is a trainee property manager. James is a landscape and maintenance person. James also assists Bradley when needed.

### D. Events Leading to Chapter 11 Filing.

Here is a brief summary of the circumstances that led to the filing of this Chapter 11 case: (1) The recent recession hurt the Debtor which caused an unusual drop in the vacancy rates of Debtor's property; (2) The surge in the sub-prime mortgage lending caused people to move out as ownership in homes became more accessible; (3) As the recession grew worse, the repair cost in preparing units for the next occupant also increased; (4) Eventually, the Debtor faced a severe cash crunch and found that the bank was no longer willing to work with him and instead filed a notice of intent to foreclose.

### E. Significant Events During the Bankruptcy

#### 1. Bankruptcy Proceedings

The following is a list of significant events which have occurred during this case: The

most significant event was the approval of the use of cash collateral. The Debtor through Order of the Court granted the Debtor's ability to use cash collateral with the provisions that First National Bank of Fort Smith would receive $40,000 per month as an adequate protection payment and the Debtor would otherwise limit its spending to the normal operating costs of the Debtor. Additionally, the Debtor filed Motions to hire counsel and an accountant. Both Motions to Employ have been granted. Currently, there are no adversary proceedings in this case. There are no Motions still pending before the Bankruptcy Court.

2. **Other Legal Proceedings**

There are no nonbankruptcy legal proceedings involving the Debtor. The principal, James H. Lemmon is involved in a civil action against EverHome Mortgage. Said civil action is not of consequence to the Debtor except to the extent that the Debtor is holding personal funds of James H. Lemmon which were deposited into an account of the Debtor prior to the filing of bankruptcy which were to be used in furtherance of said civil litigation.

3. **Actual and Projected Recovery of Preferential or Fraudulent Transfers**

Currently, the Debtor is unaware of any fraudulent transfer and presently does not anticipate filing any such action in this case.

4. **Procedures Implemented to Resolve Financial Problems**

To attempt to fix the problems which led to the bankruptcy filing, the Debtor has implemented the following procedures: (1) Reduced overhead cost; (2) filed bankruptcy to deal with the Bank debt; (3) implemented management controls; (4) improved leasing cost controls; (5) cleaned and updated certain properties; (5) concentrated on effective advertising at a manageable cost; (6) increased the occupancy rates as high as 78% but normalizing at around 75%; (7) begun negotiations on the sale of certain parcels of property to reduce debt and generate increased cash flow.

5. **Current and Historical Financial Conditions**

The following documents are attached to provide this information:

Exhibit "A" - the Debtor's March Operating Report

Exhibit "B" - the Debtor's April Operating Report

Exhibit "C" - Proposed Operating Budget of Jayel Corporation

## III.

## SUMMARY OF THE PLAN OF REORGANIZATION

**A. What Creditors and Interest Holders Will Receive Under the Proposed Plan**

As required by the Bankruptcy code, the Plan classifies claims and interests in various classes according to their right to priority. The Plan states whether each class of claims or interests is impaired or unimpaired. The Plan provides the treatment each class will receive.

**B. Unclassified Claims**

Certain types of claims are not placed into voting classes; instead, they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Proponent has not placed the following claims in a class.

**1. Administrative Expenses**

Administrative Expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Code section 507 (a) (1). The Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment. For example, the Debtor has filed for approval to hire its attorney and accountant. These professionals will submit their application for approval of their fees and cost no more than every 120 days. Court approval on all fees of the forementioned professionals is required. For all fees except Clerk's Office fees and U.S. Trustee's fees, the professional in

question must file and serve a properly noticed fee application and the Court must rule on the application. Only the amount of fees allowed by the Court will be owed and required to be paid under this Plan.

The Debtor has paid its attorney a prepetition retainer of which $8,560 is currently being held to apply against ongoing chapter 11 legal work. The accountant has not received a retainer and will submit her time under application as noted above. The Debtor must make quarterly payments to the U. S. Trustee's Office based upon the disbursements of the Debtor for the past quarter. Based upon current disbursements, the Debtor estimates that the quarterly disbursements will be in the $650.00 range.

### 2. Priority Tax Claims

Priority tax claims are certain unsecured income, employment and other taxes described by Code Section 507 (a) (8). The Code requires that each holder of such 507 (a) (8) priority tax claim receive the present value of such claim in deferred cash payments, over a period not exceeding six years from the date of the assessment of such tax. The debtor estimated in his Bankruptcy Schedules taxes due of approximately $30,000.00. The proofs of claims in the Debtor's case for taxes currently are $24,563.22. So, the tax obligation for the Debtor should be less than originally expected.

## C. Classified Claims and Interests

### 1. Classes of Secured Claims

Secured Claims are claims secured by liens on property of the estate. The Debtor has only one class of secured claims and only one secured creditor. The Debtor's Bankruptcy Schedules list the Secured creditor as the Bank of Rogers; however, it is the Debtor's belief that the Bank of Rogers is either owned or associated with First National Bank of Fort Smith and the two names will possibly be used interchangeably. The Bank and the Debtor disagree with

some on the valuation of the Debtor's properties. The Debtor believes the properties owned have a value in excess of 14,000,000 (fourteen million dollars) with a debt owed of approximately 9,300,000 (nine million three hundred thousand).

### 2. Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Code Sections 507 (a) (3), (4), (5), (6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows: the Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim. However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims. The Debtor does not believe that any such claims exist and therefore will not be treated by Debtor's Plan.

### 3. Class of General Unsecured Claims

General Unsecured Claims are unsecured claims not entitled to priority under Code Section 507 (a). The Debtor has only one unsecured claim. AMI, the lone creditor will receive 90% of its claim thus making it an impaired class.

### 4. Class(es) of Interest Holders

Interest Holders are the parties who hold ownership interest (i.e., equity interest) in the Debtor. If the Debtor is a corporation, entities holding preferred or common stock in the Debtor are interest holders. If the Debtor is a partnership, the interest holders include both general and limited partners. If the Debtor is an individual, the Debtor is the interest holder. James H. Lemmon and Jean A. Lemmon each hold a 50% interest in the Debtor corporation. Included in the Debtor's budget is a $4,000.00 monthly salary for James H. Lemmon paid as income for managing the corporation. The Debtor has no planned dividend distribution to its principals and any increase in salary to Mr. Lemmon would only come after notice and a hearing and with an

opportunity to object by Debtor's creditors.

**D. Means of Effectuating the Plan**

    1. **Funding for the Plan**

The Debtor is a corporation which has been involved in real estate development. Since the downturn in the economy, there hasn't been much activity in the way of new development. Primarily, the corporation is concentrated upon the renting and leasing of its existing inventory of single and multi-family units. The Attached Exhibits show the Debtor's cash flow and budget. Currently, the Debtor has around a 75% occupancy rate in its units. The Debtor's goal is to increase this rate to 88% or above, however, even minor increases will have a significant effect on the Debtor's cash flow and profitability.

    2. **Post-confirmation Management**

James H. Lemmon will continue to manage the Debtor Corporation as he has done for the last 20 plus years.

    3. **Disbursing Agent**

James H. Lemmon will act as the disbursing agent for the purpose of making all distributions provided for under the Plan. Disbursing Agent shall serve without bond and shall not receive any compensation for such services. The Debtor considers this as part of the salary of Mr. Lemmon as disclosed above. Mr. Lemmon will be reimbursed for any document expenses, if any, associated with the disbursement of funds.

**E. Risk Factors**

The proposed Plan has the following risks: (1) While the occupancy rate is at or near historic lows for the Debtor, the occupancy rate could drop further making it difficult to make the note payments to the Bank of Rogers. As noted above, a slight increase in occupancy rates could show dramatic improvement in the Debtor's profitability. The opposite would be true for a slight decrease leaving the

Debtor in a cash flow bind; (2) The Debtor is proposing an interest rate to the Bank of Rogers at what the Debtor believes to be fair and taking into account associated risks of the Bank. It is anticipated that the issue of what is a fair rate will have to be tried to the Bankruptcy Judge.  The determination of that issue will have an effect on the feasibility and likelihood of success of the Debtor's Plan; and (3) Any business is subject to the risks of doing business and unforeseen circumstances.  Lawsuits, weather related damages, and unanticipated repair costs could all potentially affect the smooth operation of the Debtor Corporation.

    **F. Other provisions of the Plan**

        **1. Executory contracts and Unexpired Leases**

The Debtor will maintain the leasing arrangements with all of its tenants as entered into in the normal course of the Debtor's business.  Additionally, the Debtor will continue to use Bradley Birchfield and James Coursey who will continue to perform contracted management and maintenance functions for the Debtor.

        **2. Changes in Rates Subject to Regulatory Commission Approval**

The Debtor is not subject to governmental regulatory commission approval of its rates.

        **3. Retention of Jurisdiction**

The Bankruptcy Court will retain jurisdiction to the extent provided by law.

    **G.  Tax Consequences of the Plan**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS.  The following disclosure of possible tax consequences is intended soley for the purpose of alerting readers about possible tax issues this Plan may present to the Debtor.  The Proponent CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which

make it difficult to state completely and accurately all the tax implications of any action.

The Debtor has two individuals which work on a contract and commission basis and therefore has no 940 or 941 tax concerns. The only salaried employee of the Debtor is James H. Lemmon who is also a principal of the Debtor Corporation.

The Debtor has substantial net carry over losses from previous years due to a number of factors including depreciation. Based upon the carryover losses it would be some time before the Debtor Corporation would have a tax liability on profits even if the Debtor Corporation shows profits in the first several years of the Plan operation.

The Debtor would rather not sell any of the properties and instead continue to carry the properties as income producing properties. Should the Debtor need to sell any of the owned properties, there would be the potential for capital gains taxes. The Debtor would have a difficult time projecting the presence or impact of any capital gains tax due to the net operating loss carryovers and the fact that Bank of Rogers has cross-collateralized so many of the properties.

The primary tax liability and concern of the Debtor Corporation is to keep the property taxes paid on time. In the past, the Debtor has had a difficult time keeping up with the taxes because of diminished cash flow. As shown in the Debtor's budget, the Debtor has allocated within the monthly budget sufficient funds to stay current on these taxes.

## IV.

### CONFIRMATION REQUIRMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OR THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended soley for the purpose of alerting readers about basic confirmation issues, which they wish to consider, as well as

certain deadlines for filing claims. The proponent CANNOT and DOES NOT represent the discussion contained below is a complete summary of the law on the topic.

Many requirements must be met before the Court can confirm a Plan. Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible. These requirements are not the only requirements for confirmation.

### A. WHO MAY VOTE OR OBJECT

#### 1. Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan; but as explained below, not everyone is entitled to vote on the acceptance or rejection of the Plan.

#### 2. Who May Vote to Accept/Reject the Plan

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

##### a. What is an Allowed Claim/Interest

As noted above, a creditor or interest holder must first have an allowed claim or interest to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim. When an objection to a claim or interest is filed, the creditor or interest holder holding the claim in interest cannot vote unless the Court, after notice and a hearing, either overrules the objection or allows the claim or interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE has not yet been set by the court. The Debtor's Plan is seeking a bar date of September 20, 2010 and, if the Plan is confirmed, this will be the date by which all claims must be filed in order

to be paid. A creditor or interest holder may have an allowed claim or interest even if a proof of claim was not timely filed. A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest. Exhibit "D" which is attached is Schedule "D" from the Debtor's Bankruptcy Petitions and Schedules and represents what the Debtor believes to be its secured claims. Exhibit "E" which is attached is Schedule "E" from the Debtor's Bankruptcy Petitions and Schedules and represents what the Debtor believes to be its priority claims. Exhibit "F" which is attached is Schedule "F" from the Debtor's Bankruptcy Petitions and Schedules and represents what the Debtor believes to be its unsecured claims. You may review these Exhibits to determine how the Debtor views your claims.

### b. What is an Impaired Claim/Interest

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is impaired under the Plan. A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the member of that class 100% of what they are owed.

In this case, the Debtor believes that only Class 2 and 4 are impaired classes. Class 2 is the class of secured debts held by Bank of Rogers/First National Bank of Fort Smith. Class 4 is the class of general unsecured claims which consists of one creditor. The holder of the claims in class 2 and 4 are therefore entitled to vote to accept or reject the Plan. Proponent believes that classes 1 and 3 as proposed in the Debtor's plan are unimpaired classes and therefore do not have the right to vote to accept or reject the Plan.

Parties who dispute the Proponent's characterizations of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Proponent has incorrectly characterized the class.

### 3. Who is Not Entitled to Vote.

The following four types of claims are <u>not</u> entitled to vote: (1) claims that have been disallowed; (2) claims in an unimpaired class; (3) claims entitled to priority pursuant to Code Sections 507 (a) (1), (2) and (8); and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority under 507 (a) (1), (2) and (7) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO CONFIRMATION OF THE PLAN.

### 4. Who may Vote in More Than One Class.

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

### 5. Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders with that Class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" or non-accepting classes, as discussed later in (IV.A.8.).

    **a. Votes Necessary to Accept the Plan**

A class of claims is considered to have accepted the Plan when more than ½ in Number and at least two-thirds (2/3) in dollar amount of the claims which actually voted, voted in favor of the Plan. A class of interests is considered to have accepted the Plan when at least two-thirds (2/3) in amount of the interest-holders of such class which actually voted, voted to accept the Plan.

### b. Treatment of Nonaccepting Classes

As noted above, even if all impaired classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the nonaccepting classes are treated in the manner required by the Code. The process by which nonaccepting classes are forced to be bound by the terms of the plan is commonly referred to as "cramdown." The Code allows the Plan to be "crammed down" on nonaccepting classes of claims or interests if it meets all consensual requirements except voting requirements of 1129 (a) (8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11. U.S.C. Section 1129 (b) and applicable case law.

### c. Request for Confirmation Despite Nonacceptance by Impaired Class(es).

The party proposing this Plan will ask the Court to confirm this Plan by cramdown on impaired class 2 if this Class does not vote to accept the Plan.

### 6. Liquidation Analysis

Another confirmation requirement is the "Best Interest Test" which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is an impaired class and that claimant does not vote to accept the Plan, then the claimant or interest holder must receive or retain under the Plan property of value not less than the amount that such holder

would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Court to be able to confirm this Plan, the Court must find that all creditors and interest holders who do not accept the plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. The Plan Proponent maintains that this requirement is met here for the following reasons: (1) There are only two classes of impaired claims; (2) Bank of Rogers which holds the secured claims to 99% of the business assets and all of the secured property. Bank of Rogers will retain its liens securing such claims and will receive deferred cash payments totaling at least the amount of such claim. Further, upon any sale of property per section 363 of the Code, the Bank's liens will attach to the proceeds from said sale and the Bank may credit bid its claim. The Proponent if able may elect to retain the cash from the sale if it can substitute collateral of similar quality and value to that which was sold. (3) Additionally, while bankruptcy courts do not even seem clear what it means to provide the secured creditor the indubitable equivalent of its claim, the Debtor will attempt to do just that. Indubitable equivalent means in laymen's terms "too evident to be doubted." Usually if all the collateral is transferred to the secured creditor in satisfaction of the secured creditor's claim, indubitable equivalence has been obtained. Secured creditor Bank of Rogers has an estimated six notes with the Debtor. The Debtor does not interpret surrender of all collateral as meaning

surrender of anything more than the collateral secured by the specific note. (4) The unsecured creditor will receive 90% of its allowed claim. While it is possible that said creditor could receive 100% in a chapter 7 liquidation, there is always the possibility of market changes and whether or not the property would be sold at market value which is what is listed in the Debtor's schedules or liquidation value which is what would happen in a chapter 7 context. Therefore, it is possible that said creditor would receive nothing in a chapter 7 liquidation.

### C. Feasibility

Another requirement of confirmation involves the feasibility of the Plan which means that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of feasibility analysis. The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the claims and expenses which are entitled to be paid on such date. The Plan Proponent maintains that this aspect of feasibility is satisfied. Debtor presently collects between $65,000 and $75,000 per month in rents and while it would be difficult to determine what cash balance would be available on the Effective Date of the Plan, it should easily be sufficient to cover all required Administrative Expenses, statutory costs and charges and other Plan payments which would be due on the Effective Date.

The Second aspect considers whether the Proponent will have enough cash over the life of the Plan to make the required Plan payments. The Debtor has included its initial budget in attached Exhibit "C". The budget shows a cash surplus, however, it is anticipated that the Debtor and the Bank of Rogers will need to litigate the interest rate to be paid to the Bank prior to or at the hearing on the confirmation of the Plan. While the Debtor is confident that the Debtor will be able to pay whatever rate the Court sets, the closer the rate is to that which is proposed in the Debtor's Plan, the more likely the Debtor will be

successful. The Debtor's Budget is based upon the prime rate plus .50% for risk adjusted factor for the first year with an increase to 1% above the prime rate for subsequent years.

## V.
## EFFECT OF CONFIRMATION OF PLAN

### A. Discharge

This Plan provides that upon payment in full of proposed plan payments to the unsecured creditors, debtor shall be discharged of liability for payment of debts incurred before confirmation of the Plan, to the extent specified in 11 U.S.C. Section 1141. However, the discharge will not discharge any liability imposed by the Plan.

### B. Revesting of Property in the Debtor

Except as provided in Section (V.E.), and except as provided elsewhere in the Plan, the confirmation of the Plan revests all of the property of the estate in the Debtor.

### C. Modification of Plan

The Proponent of the Plan may modify the Plan at any time before confirmation. However, the Court may require a new disclosure statement and/or revoting on the Plan. The Proponent of the Plan may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

### D. Post-Confirmation Status Report

Within 120 days of the entry of the order confirming the Plan, Plan Proponent shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan. The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those parties who have requested special notice. Further status reports shall be filed every

120 days and served on the same entities.

### E. Post-Confirmation Conversion/Dismissal

A creditor or party in interest may bring a motion to convert or to dismiss the case under 1112(b), after the Plan is confirmed, if there is a default in performing the Plan. If the Court orders the case to be converted to a chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the plan, will revest in the Chapter 7 estate. The automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during this case.

The order confirming the Plan may also be revoked under very limited circumstances. The Court may revoke the order if the order of confirmation was procured by fraud and if the party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the order of confirmation.

### F. Final Decree

Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the Plan Proponent, or other party as the Court may designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case.

Date:  6-17-2010

/s/ James H. Lemmon, for the Debtor  
James H. Lemmon

/s/ Don Brady, Attorney for Plan Proponent  
Don Brady  
BLAIR & BRADY  
109 N. 34th Street  
Rogers, Arkansas 72756  
479-631-0100